[No. 18819-8-II.  Division Two.  November 20, 1998.]

*In the Matter of the Marriage of* GARY PAPE, *Petitioner,* and MARGARET JOHNSON-PAPE, *Respondent.*

*John S. Mills*, for petitioner.

*Barton L. Adams* of *Adams & Adams*; and *James A. Cathcart* of *Bonneville, Viert, Morton & McGoldrick*, for respondent.

HUNT, J. — Gary Pape appeals a "temporary" order granting Margaret Johnson-Pape's motion to modify the parties' agreed parenting plan under RCW 26.09-.260(4)(b)(iii). This order ratified Johnson-Pape's having moved their children to Clark County, contrary to the parenting plan agreement that neither parent would move them more than ten miles from Pierce County without the other's consent. We reverse, vacate our earlier opinion, and remand.

## FACTS
### A. Parenting Plan

Margaret "Peggy" Johnson-Pape (Johnson-Pape) and Gary Pape (Pape) were married in 1983. They have two children, W, born July August 31, 1986, and C, born May 18, 1990. The family was living in Gig Harbor when the parents separated in 1992. On July 19, 1994, Pierce County Superior Court Judge Steiner dissolved their marriage by letter ruling, noting: "The parties have agreed upon a Parenting Plan, which the Court will adopt and sign when presented." The court formally adopted and signed the agreed permanent parenting plan three months later, on October 7, 1994.

The permanent parenting plan provided that the children would reside: most school nights and alternate weekends with their mother, Johnson-Pape; and alternating midweek overnights and evenings and alternate three-night weekends with their father, Pape. The children's residential time with Pape was specifically tailored to accommodate monthly YMCA Indian Princesses father-daughter weeknight and weekend activities.[1] The parents

---

[1] II. RESIDENTIAL ARRANGEMENTS

  A. SCHOOL YEAR SCHEDULE

  1.1 The children will reside with their father every other weekend from 5:30 p.m. Friday through Monday morning at between 7:00 - 7:30 a.m. The pick-up from those visits will be from the childrens' daycare if requested by mother. The father will provide transportation for the pick-ups for his alternate weekend visits. The mother will provide transportation for the return of the children on Monday morning between 7:00 - 7:30 a.m.

expressly agreed that changing the children's school and moving them or their daycare further than ten miles outside Pierce County were major decisions requiring the consent of both parties.[2] The parenting plan also specified a

> Each child will reside with the father on alternate Tuesdays until Wednesday morning before school. Thus, one Tuesday [C] shall reside with the father until Wednesday morning; the next Tuesday [W] shall reside with the father until Wednesday morning. The dates of such visits may be modified by Gary if [W]'s Indian Princess meetings are changed from Tuesday night to another night. . . .

> 1.2 Both children will reside with their father on alternate Mondays from 5:30 p.m. to 8:00 p.m. The alternate Mondays will follow the weekends in which the mother had the children with her. . . .

> 1.3 Indian Princess/Guide events will guide how the Tuesdays are alternated between the children. On the weekends Indian Princess or Guide events occur, the children will reside with their father. The mother will be able to schedule a "make-up" weekend. . . .

[2]The parenting plan opens with the following provisions:

## I. DECISION-MAKING

### A. GENERAL

1. The parents desire to remain responsible and active in the child[ren's] growth and development consistent with the best interests of the children. The parents will make a mutual effort to maintain an open, ongoing communication concerning the development, needs and interests of the children and will discuss together any major decisions which have to be made about or for the children.

    1.1 [m]ajor decisions concerning the children's welfare shall be made by both parties.

2. Major decisions are the following:

    . . . .

    2.2 Change of school not mandated by authorities.

    2.3 *Moving the children or daycare outside of the area including all of Pierce County and a ten-mile driving radius outside of the borders of Pierce County.*

    2.4 Choice of permanent care providers.

    . . . .

5. *[n]or will either parent make plans and arrangements that would impinge upon the other parent's authority or time with the children without the express agreement of the other parent. . . .* It is the intent of the guardian ad litem to encourage a direct child-parent bond.

dispute resolution process, which provided for arbitration and a right of review by the superior court.[3]

## B. Trial Court Proceedings

During the marriage, Johnson-Pape had combined parenting with working part time as a substitute teacher. During the dissolution process, she sought future full-time employment. On August 16, 1994, she was offered a one-year teaching position at an elementary school in Camas, Clark County, where she had previously taught. This job

---

B. **EDUCATION**

1. *The children shall attend the school decided upon by both parties, recognizing that the decision should be made in the best interests of the children's education needs, rather than the needs of the parents.*

    1.1 All schools, other than the public schools in the district where the children reside, health care providers, and counselors shall be selected by both parties, except that [W] may continue to see Jackie Fisher-Havens in the discretion of the mother for a period of nine months after the entry of this parenting plan. The parents will further jointly select a family counselor for treatment of the family, to commence in September, 1994.

(Emphasis added.)

[3]The dispute resolution provision provides:

A. Any decision concerning the children shall be made only after consideration is given to their needs, feelings, and desires.

B. In the event that there are difficulties or differences of opinion between the parents regarding provisions for the children, the matter shall be referred to a private arbitrator chosen by the parties. The Guardian ad Litem recommends Marc Christianson.

C. In undertaking this dispute resolution process, the parents agree:

   1. That preference shall be given to carrying out the parenting plan;

   2. *That the parents shall use the designated process to resolve the disputes* relating to implementation of the plan, except those related to financial support, *unless an emergency exists*;

   3. If the court finds that a parent has used or frustrated the dispute resolution process without good reason, the court shall award attorney's fees and financial sanctions to the prevailing party; and

   4. *The parents have the right of review from the dispute[ ] resolution process to the Superior Court.*

(Emphasis added.)

was to begin one week later, on August 24, 1994. On August 19, Johnson-Pape filed a motion for a temporary order, requesting suspension of the parenting plan's ten-mile geographic restriction so that the children could move with her to Clark County, approximately 150 miles from Gig Harbor. Johnson-Pape declared that she was unable to use the parenting plan's dispute resolution process because the suggested mediator/arbitrator was on vacation.[4]

Pape opposed the motion and requested enforcement of the agreed parenting plan, which the court had orally approved but had not yet been signed. Pape argued that the move was not in the children's best interest because: (1) The children's friends and extended family all live in Gig Harbor and the Tacoma area; (2) the move would eliminate one child's participation in an ongoing accelerated learning program at school; (3) the move would eliminate one child's participation in the YMCA's Indian Princesses program with her father; and (4) the move would disrupt one child's ongoing counseling. Without Pape's consent and without a court order, Johnson-Pape moved the children to Vancouver.[5]

After several interim hearings, on October 7, 1994, Pierce County Superior Court Judge Steiner entered the decree of dissolution and approved and filed the permanent parenting plan. The court simultaneously modified the parenting plan by suspending the children's Pierce County restriction

---

[4]Originally, Johnson-Pape sought suspension of the plan's geographic restriction until the matter could be *mediated* by Marc Christianson. But the parenting plan creates a mechanism for arbitration, not mediation. In any event, the record discloses that the dispute was neither mediated nor arbitrated, and Pape never asserted a demand for arbitration. The parties agreed at oral argument on their motions for reconsideration before this Court of Appeals on August 17, 1998, that the parties had waived the parenting plan's dispute resolution process.

[5]On August 31, 1994, Commissioner Foley entered an order requiring the parties to comply with the agreed plan until Judge Steiner could hear the motion. On September 2, 1994, Johnson-Pape obtained an emergency hearing and Judge Verharen orally stayed the Commissioner's ruling until Judge Steiner could hear the matter, which did not occur until several weeks later. In late September or early October (the record is unclear) counsel argued the motion during a telephone conference with Judge Steiner. By this time Johnson-Pape had already moved with the children.

for the 1994-95 school year. The court also required another hearing to adjust the residential schedule, because the modification would render impractical Pape's midweek time with the children. Pape appealed the October 7, 1994, order.

At the conclusion of the children's first school year in Clark County, the temporary 1994 modification order expired but Johnson-Pape and the children remained in Vancouver. On June 23, 1995, Pape moved for an order finding Johnson-Pape in contempt for failing to move the children back to Pierce County.

After several hearings, Johnson-Pape cross-moved for modification. Having obtained a new teaching job in Vancouver, she sought a second year extension of the 1994 temporary suspension of the geographic restriction on the children's residence, schooling, and daycare. On October 13, 1995, Pierce County Superior Court Judge Hayes granted her motion and temporarily suspended for a second year the parenting plan's geographic restriction on the children's residence, pending a final determination. The court also appointed a guardian ad litem to investigate the best way to adjust the children's residential schedule to make up for their lost midweek time with their father. The trial court declined to consider Pape's petition to be named the primary residential parent until Pape noted an "adequate cause hearing."[6] Pape did not schedule the hearing.

Appellate Proceedings

Instead, Pape sought appellate review. On December 11, 1996, we granted Pape discretionary review of the 1994 and 1995 parenting plan modification orders. Our commissioner deemed Pape's notice of appeal from the 1994 order

---

[6]In an "adequate cause hearing," Pape would have had the high burden of demonstrating that the children's "present environment is detrimental to the child's physical, mental, or emotional health and the harm likely to be caused by a change of environment is out-weighed by the advantage of a change to the child." RCW 26.09.260(2)(c).

amended under RAP 5.3(h) to include the 1995 order and, thus, properly subject to review.

On November 26, 1997, we issued a published opinion reversing and remanding to the trial court for a hearing on the propriety of Johnson-Pape's move under the Supreme Court's newly announced *Littlefield*[7] standards. Both parties filed motions for reconsideration on several grounds. Pape contends that *Littlefield* is inapplicable to *agreed* geographic restrictions, such as the one here. Johnson-Pape argues that trial courts must always have discretion to adjust parenting plans to real life situations so long as they are acting in the best interests of the children. We granted reconsideration and conducted a specially set oral argument on August 17, 1998. We now grant, in part, the parties' motions for reconsideration; withdraw our November 26, 1997, opinion; and substitute this new opinion.

ANALYSIS
I. Parenting Plans
A. Best Interests of the Child

The Legislature enacted the Parenting Act of 1987, in part, to encourage divorcing parents to agree between themselves about how best to care for their children.

> Washington's Parenting Act represents a unique legislative attempt to reduce the conflict between parents who are in the throes of a marriage dissolution by focusing on continued 'parenting' responsibilities, rather than on winning custody/ visitation battles.

*In re Marriage of Kovacs*, 121 Wn.2d 795, 800, 854 P.2d 629 (1993) (citations omitted). "The statute also attempts to encourage amicable settlements of disputes connected with separation and marriage dissolution." *In re Marriage of Littlefield*, 133 Wn.2d 39, 58, 940 P.2d 1362 (1997) (citing RCW 26.09.070).

Agreed parenting plans are frequently the product of

---

[7] *In re Marriage of Littlefield*, 133 Wn.2d 39, 940 P.2d 1362 (1997).

such negotiation. In exchange for a plan that balances parenting responsibilities, a parent may decide to forgo seeking primary designation. Here, rather than litigating which parent would provide the children's residence a majority of the time, Pape yielded the children's primary residence[8] to Johnson-Pape. In exchange, Johnson-Pape agreed that she would not move the children 10 miles from Pierce County without his consent, thus ensuring Pape's frequent and substantial interaction with their children, including midweek.

Whether the product of parental negotiation or court-imposition, the Parenting Act requires that parenting plans serve the "best interests" of the child and foster the child's relationship with *both* parents:

> *In any proceeding between parents under this chapter, the best interests of the child shall be the standard* by which the court determines and allocates the parties' parental responsibilities. The state recognizes the fundamental importance of the parent-child relationship to the welfare of the child, and that the relationship between the child and *each* parent should be fostered unless inconsistent with the child's best interests. The best interests of the child are served by a parenting arrangement that best maintains a child's emotional growth, health and stability, and physical care. Further, the best interest of the child is ordinarily served when the existing pattern of interaction between a parent and child is altered only to the extent necessitated by the changed relationship of the parents or as required to protect the child from physical, mental, or emotional harm.

RCW 26.09.002 (emphasis added).

## B. Modification

■ The Parenting Act disfavors altering parenting plans.

[8]The term "primary residential parent" does not appear in the Parenting Act, but it has been used by courts and commentators as a shorthand reference to the parent with whom the children reside a majority of the time. It is not a concept, however, to be used interchangeably with the now defunct "custodial parent" concept. *See* 2 House Journal 50th Leg., Reg. Sess. 1539 (1987).

*See* RCW 26.09.260(1). Modification is allowed only under specific circumstances and only if "necessary to serve the best interests of the child": .

> Except as otherwise provided in subsection (4) of this section, the court shall not modify a prior custody decree or a parenting plan unless it finds, upon the basis of facts that have arisen since the prior decree or plan or that were unknown to the court at the time of the prior decree or plan, that a substantial change has occurred in the circumstances of the child or the nonmoving party and that the modification is in the best interest of the child and is necessary to serve the best interests of the child.

RCW 26.09.260(1).

### 1. Minor Modification

■ By its plain language, subsection (1) is read in conjunction with subsection (4):

> (4) The court may order adjustments to a parenting plan upon a showing of a substantial change in circumstances of either parent or of the child, and without consideration of the factors set forth in subsection (2) of this section, *if the proposed modification is only a*:
>
> (a) Modification in the dispute resolution process; or
>
> (b) *Minor modification* in the *residential schedule* that:
>
> (i) Does not change the residence the child is scheduled to reside in the majority of the time; and
>
> (ii) Does not exceed twenty-four full days in a calendar year or five full days in a calendar month; or
>
> (iii) Is based on a change of residence or an involuntary change in work schedule by a parent which makes the residential schedule in the parenting plan impractical to follow.

RCW 26.09.260(4) (emphasis added).

Subsection (4) is the statutory provision under which Johnson-Pape sought and the trial court granted minor modification of the parenting plan. RCW 26.09.260(4).

Subsection (4)(b) allows "adjustments" to a parenting plan "if the proposed modification is *only a*" minor modification "in the *residential schedule.*" RCW 26.09.260(4)(b) (emphasis added). Here, the trial court's modification: (1) altered the children's residential schedule to accommodate Johnson-Pape's move to Clark County; (2) nullified the agreed geographic restriction on the children's residence; (3) changed the children's daycare; (4) changed the children's schooling; and (5) eliminated Pape's participation in the children's after-school midweek activities, midweek residence with him, and Indian Princesses, all without Pape's consent, contrary to the express provisions of the plan.

## 2. *Bower v. Reich*

Division One reads subsection (4)(b)(iii) as authorizing minor modification of a parenting plan based merely on a parent's change of residence, apparently without regard to the best interests of the children. *Bower v. Reich*, 89 Wn. App. 9, 964 P.2d 359 (1997). But such interpretation invites parenting plan modifications that conflict with the Legislature's clearly stated policy of serving children's best interests by fostering continuity of parent-child relationships and stability of parenting plans.

In *Bower*, the petitioning mother sought to move with the child to California so that she could attend a graduate program. The court reasoned: "The statute does not limit the change of residence to a relocation within the state's boundaries. We cannot rewrite the plain words [of the statute]. . . ." *Bower*, 89 Wn. App. at 16. *Bower* held: If a proposed modification fits the statutory criteria of subsection (4), the modification is per se "minor." *Bower*, 89 Wn. App. at 16-17; and under subsection (iii), "a change of residence" that "makes the residential schedule . . . impractical to follow" is all that is required for a parent's proposed move to be characterized as "minor." Thus, according to Division One, *any* proposed parental move, and corresponding request to move the children, is, by definition, a

"minor" modification, regardless of the distance and the resultant impact on the children, their ability to continue their relationships with the other parent in a meaningful way, and the degree of deviation from core provisions of the parenting plan.

*Bower*'s application of RCW 26.09.260(4)(b)(iii) ignores the Legislature's explicit policy underlying the Parenting Act—that parenting plans and modifications must serve "the best interests of the child." RCW 26.09.002, and RCW 26.09.260(1), respectively. Therefore, we respectfully decline to extend the reasoning of *Bower* to this case.

### a. *Littlefield*

*Bower* emanates from Division One's interpretation of the Supreme Court's holding in *Littlefield* that there is nothing in the Parenting Act that

> gives the trial court the authority *to restrict a parent from moving away* from the child, or away from the other parent, unless a limiting factor exists, under RCW 26.09.191, which warrants the restriction.

*Littlefield*, 133 Wn.2d at 56 (emphasis added).[9] But *Littlefield* does not apply to the facts here. Unlike *Littlefield* and *Bower*, Pape has not sought to restrict where Johnson-Pape lives or works; rather, he seeks to enforce the parenting plan requirement that the children reside in or within 10 miles of Pierce county unless *both* parents consent to their moving away.

---

[9]*Bower* extended the rationale of *Littlefield*, a parenting plan establishment case, to parenting plan modifications:

> To the same extent that a court lacks authority to impose a geographical restriction upon a parent's residence at the time of dissolution, it similarly lacks authority to impose such a restriction when modifying the decree. And because a court ordinarily has no authority under the Parenting Act to restrict the primary residential parent's choice of residence, a proposed move, otherwise qualifying as a minor modification of a parenting plan does not become elevated to a major modification merely by virtue of distance or crossing state lines.

*Bower*, 89 Wn. App. at 18.

Moreover, *Littlefield* involved a *court-imposed* geographic restriction on an unwilling party, under RCW 26.09.191. *Littlefield* justifies such a restriction only if a court finds that the child would suffer harm greater than the "normal distress" of travel and infrequent contact with a parent, or "other hardships which predictably result from a dissolution of marriage." *Littlefield*, 133 Wn.2d at 55.[10]

Again, the case before us does not involve a court-imposed geographic restriction on unwilling parents. In contrast with *Littlefield*, this case involves parents who willingly incorporated into the agreed permanent parenting plan, a geographic restriction on the children's residence, daycare, and schooling, in return for which concessions were made in negotiating the parenting plan.

### b. Statutory Interpretation

■ ■ We disagree with the implication in *Bower* that a parent's change of residence or work schedule automatically qualifies for minor modification of a parenting plan under RCW 26.09.260(4)(b)(iii) without regard to the best interests of the children. Throughout the Parenting Act the Legislature has repeatedly made clear that the paramount concern is the best interests of the child, not the convenience of parents, in both the establishment and modification of parenting plans, both permanent and temporary. RCW 26.09.002, .197, .260.

The Parenting Act does not prevent parents from agreeing to geographic restrictions on their children's residence or schooling. Rather, as we previously noted, the Parenting Act strongly encourages parents to reach agreement concerning postdissolution parenting arrangements that serve the children's best interests and that foster *both* parents' continuing relationships with their children. RCW 26.09.002, RCW 26.09.184(1)(f). It logically follows that parents should generally be able to enforce such agreed

---

[10]We erred in our November 1997 remand to the trial court to conduct a hearing applying the *Littlefield* test of detriment to the children caused by the move.

restrictions, so long as such enforcement is in the best interests of the children. Although ultimately it is the Legislature's, not the court's, prerogative to amend the statute as necessary to implement its objectives,[11] it is nevertheless clear that the overriding intent of the Parenting Act is to serve the best interests of children.

Here, the trial court erred in modifying the parenting plan, whether temporarily or permanently, without inquiring into and basing its decision on the best interests of the children. This inquiry and determination must be made on remand as follows: The trial court should enforce the parenting plan unless it determines that it is in the children's best interests to live, to attend school, and to go to daycare in Clark County rather than within 10 miles of Pierce County. In making this determination, the court should look to the time of remand.[12] *See George v. Helliar,* 62 Wn. App. 378, 384, 814 P.2d 238 (1991).[13]

We decline to award attorney fees to Johnson-Pape under RCW 26.09.140.

## C. Conclusion

We hold that the trial court erred in modifying the parenting plan to allow Johnson-Pape's relocation of the children, without Pape's consent, and without considering the best interests of the children. We grant, in part, both par-

---

[11]*See* 1998 House Bills 3011 and 3062, which proposed notice requirements and criteria to guide the courts in determining whether to allow children to move away. House Bill 3011 was based on the Model Relocation Act adopted by the American Association of Matrimonial Lawyers Board of Governors in 1997.

[12]Requiring the trial court on remand to determine the best interests of the children at the time of the original petitions would prevent a parent who violates the parenting plan from claiming a superior environment as a result of having moved the children away from the other parent. But deterrence is not the objective of the Parenting Act. Rather, it is the best interests of the children, at the time they are before the court, which controls. *Helliar,* 62 Wn. App. at 384.

[13]"Mindful" that circumstances may have changed between entry of the trial court's order, from which appeal was taken, and issuance of appellate opinion, the court remanded for review of the child's current situation.

ties' motions for reconsideration, withdraw our opinion of November 26, 1997,[14] reverse the trial court's modification of the geographic restrictions in the permanent parenting plan, and remand to determine the best interests of the children. The trial court should then adjust the children's residential schedule according to the children's best interests, to foster their relationships with each parent.

BRIDGEWATER, A.C.J., and ARMSTRONG, J., concur.

Review granted at 137 Wn.2d 1019 (1999).

---

[14]Although not before us at this time, any hearing conducted on remand following our 1997 opinion is necessarily void insofar as inconsistent with this new opinion.